## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BENJAMIN E.J. VANCE, #412850      *
Plaintiff,      *
     *
v      *      Civil Action No.  ELH-14-272
     *
WARDEN BOBBY P. SHEARIN,      *
COLIN OTTEY,      *
WEXFORD HEALTH SOURCES, INC.      *
Defendants.      *
     ***

## MEMORANDUM

Benjamin E.J. Vance, a self-represented Maryland prisoner, filed suit pursuant to 42 U.S.C. § 1983, supported by exhibits, raising claims of inadequate medical care.  ECF 1, 8.[1] Defendants Colin Ottey, M.D. and Wexford Health Sources, Inc. ("Wexford") (collectively, "Medical Defendants") have filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, ECF 18, 31, with exhibits.[2]  Defendant Bobby P. Shearin, former Warden of North Branch Correctional Institution ("NBCI"), has also filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, ECF 20, with exhibits.[3]  Vance has filed

---

[1] Vance's claim of unconstitutional conditions of confinement was dismissed, without prejudice, by an earlier Memorandum and Order.  ECF 3, 4.

[2] The Medical Defendants requested sealing of their memorandum and Vance's medical records, because of the personal nature of the information pertaining to Vance. ECF 18, 27.  The court granted the motion in part and sealed the exhibits, and denied the motion in part by denying the request to seal the legal memorandum, with leave to submit a redacted memorandum and renewed motion to seal.  ECF 28.  Defendants subsequently filed a redacted version of their memorandum, ECF 31, and a second motion to seal.  ECF 32.  However, Vance opposed sealing. ECF 29, 30.  Therefore, I issued a Show Cause Order to the defense to support their sealing request.  ECF 34.  Defendants subsequently withdrew their request to seal Vance's medical records.  ECF 35.  Those records were then unsealed.  ECF 37.

[3] Shearin served as Warden at NBCI until February 18, 2014, and is no longer in the employ of the Department of Public Safety and Correctional Services.  ECF 20 at 2.  Among the

oppositions to the dispositive motions.  ECF 22, ECF 23.  The Medical Defendants and Shearin

have replied.  ECF 24, ECF 25.

On September 29, 2014, Vance filed a submission titled "Continued Violation In Above

Captioned Complaint."  ECF 38.  He complained about a severe asthma attack that occurred on

September 22, 2014, which he alleged was not adequately treated.  *Id.*  I construed ECF 38 as a

motion for preliminary injunction, and issued an order to defendants to show cause why

preliminary injunctive relief should not be granted.  ECF 39.  The responses are at ECF 40-43, and

Vance's reply is at ECF 46.

On January 23, 2015, Vance filed additional correspondence that substantially reiterates

his claims.  ECF 47.  To the extent that ECF 47 contains new claims, I will not consider them

here.  Vance may present them in a new, separate complaint.

No hearing is necessary to resolve the motions.  Local Rule 105.6.  For the reasons that

follow, I shall grant defendants' motions and deny ECF 38 and ECF 47.

## I.  BACKGROUND

On January 28, 2014, Vance, an inmate incarcerated at NBCI, filed suit alleging that

defendants acted with deliberate indifference to his serious medical needs by failing to properly

treat his asthma attacks and genital rash.  ECF 1.  He supported his suit with the Declaration of

Roger Hargrave, another inmate.  ECF 1-1.  Vance filed a Supplemental Complaint on February

26, 2014, *see* ECF 8, with exhibits.  *See* ECF 8-1.  He claims he suffered asthma attacks in his

cell on August 11, 2013 and August 26, 2013, and received no response to his calls for help.

Further, Vance contends that Shearin's violation of policies, procedures, and directives set forth

_____

declarations filed in support of Shearin's motion for summary judgment is that of Frank B.
Bishop, Jr., who succeeded him as Warden.  Richard E. Miller is currently the Acting Warden at
NBCI.  *See* dpscs. md.us/locations/nbci.shtml.

by the Maryland Department of Public Safety and Correctional Services ("DPSCS") was detrimental to his health, safety and welfare.  ECF 8 at 4.[4]  As redress, he seeks damages and injunctive relief to prevent retaliation against him for filing suit.  ECF 1 at 8.

### A. Vance's Allegations

Vance alleges that, since arriving at NBCI on July 26, 2013, he has received inadequate medical care for his worsening asthma.  He alleges that he suffered his first emergency asthma attack while at Jessup Correctional Institution ("JCI") on July 5, 2013, ECF 8 at 1, and the attacks have "dramatically worsened …."  *Id.* at 2.  Further, he avers that he was not placed on chronic care supervision until November 17, 2013.  *Id.* at 2.  Vance asserts: "Dr. Ottey had my medical file since July 26th 2013 and did not honor any request for nebulizer treatments…." *Id.*

Vance states that on August 11, 2013, he had an asthma attack and asked for medical assistance. Cellmate Roger Hargrave "made numerous request[s] to correctional officer's [sic] for emergency medical attention" for Vance.  *Id*; *see also* ECF 1-1, Ex. 1. Officer Milo indicated there was another medical emergency but help for Vance would be forthcoming.  ECF 8 at 2. None arrived.  Vance also complains that he was not permitted to order or purchase a fan.  *Id*. at 3.  In addition, Vance asserts that "out-of-doors exposure" was necessary to help him breathe and relieve the pressure on his lungs due to the high temperature in his cell and lack of a fan.  *Id.*

According to Vance, on August 26, 2013, he suffered another asthma attack and experienced chest pain and loss of breath.  Vance claims he "passed out and did not revive until morning," and was not provided emergency treatment, despite his cellmate's calls for help.  ECF 1; ECF 8 at 2.  Vance concludes that lack of emergency medical attention has caused him

---

[4] All references to page numbers in record citations are to those generated by the court's electronic case filing system.  The page numbers on the exhibits do not always correspond to the ECF page number.

permanent chest aches, increased headaches due to severe oxygen loss, increased incidents of asthma attacks, and "constant muscle contusions in [his] chest cavity and heart flutters."[5]  ECF 8 at 3.

Vance also complains that he was not examined by a physician for a genital rash that he contracted sometime between August 5, 2013, when NBCI went on lockdown, and August 15, 2013, when inmates were again permitted to shower.  He describes the condition as "some type of bacterial infection."  ECF 1 at 3. Vance asserts that on September 11, 2013, Nurse Kristy Cortez went to his cell door, gave him a fungal ointment, and recommended keeping the area clean and dry, but did not examine the rash. ECF 1 at 4.

On September 13, 2013, Nurse Vicki Ward went to Vance's cell and provided him with Tolnafate 15 gm 1% cream for fungus treatment, which caused inflammation and irritation. *Id.* On November 1, 2013, another medical provider prescribed Hydrocortisone cream 1% for Vance.  The rash cleared but returned later.  *Id.*

In support of his claims, Vance has submitted the affidavit of Roger Hargrave, his cellmate.  Hargrave avers that on September 12, 2013, and "various occasions before this date, [he] witnessed Benjamin Vance have several asthma attacks that required emergency medical attention." ECF 1-1 at 2.  Hargrove further states, ECF 1-1 at 2:

> Watching as Mr. Vance gasped for air would not work for me, so I immediately acted. First, I called out for a correctional officer, screaming, and banging on the cell door, but not officer was on the tier during the time of this incident, around 11am-12 noon.  When a correctional officer did finally come on the tier (Ofc. Hill) whom [sic] was escorting a nurse, who was passing out medicine to other inmates, I told Ofc. Hill emergency medical attention was needed in cell 38, but Ofc. Hill and the nurse ignored and went about there [sic] business. 30 minutes

---

[5] It is not clear whether Vance has accurately described his symptoms as contusions. Contusions are bruises that occur when small blood vessels under the skin tear or rupture, most often from a twist, bump, or fall.  http://www.nlm.nih.gov/medlineplus/bruises.html.   No contusions are noted in Vance's medical records.  ECF 18-4, Ex.1.

later Ofc. Milo was informed of the emergency and still no medical attention ever came, and due to the humidity on this day I watched my cellmate Benjamin Vance pass out.  Fearful and not knowing what to do I persisted screaming for help and banging to get an officer's attention and my cries for help were ignored. I felt abandoned and, but did not give up on helping my cellmate Mr. Vance.  I applied cool rags to his head and squeezed his asthma inhaler into his mouth praying that whatever the device is supposed to do worked as several minutes passed, & Mr. Vance regained consciousness and again used his asthma inhaler, drank cool water, and laid down trying to relax his breathing…. Mr. Vance also asked for ice and was refused. The day and night came to an end with no emergency attention ever applied.  This was the second time an incident like this happened and no medical attention was ever given.

**B.**     **Shearin's Motion**

Shearin's exhibits include five declarations, ARP records, and Vance's medical records. *See* ECF 20-4 to ECF 20-9.  In the Declaration of Frank Bishop, Jr., who succeeded Shearin as NBCI Warden, Bishop states that on August 5, 2013, NBCI was on lock down status after a life threatening assault was made on a correctional officer.  ECF 20-3, Exh. 1.  Due to security concerns, inmate movement was restricted until April of 2014, when the institution began to slowly resume its normal shower and recreation schedules. *Id.*

Bishop attests that health and medical care for inmates is provided by private health care contractors. He states he is not trained as a health care provider and, to the best of his knowledge, neither was Shearin. *Id.*[6]

Paul Pennington, NBCI Unit Housing Manager, attests that all inmate cells are equipped with hot and cold running water and include a sink and toilet.  ECF 20-5, Ex. 3.  And, all inmates have access to hygiene items.  *Id.*

---

[6]  The court takes notice that Shearin is not a medical professional.  *See*, *e.g.*, *Wallop v. Buck, Civil Action No.* PWG–13–2355 (D. Md. 2014).

### C. Medical Defendants' Motion

The Medical Defendants' dispositive motion is supported by verified copies of Vance's medical records, ECF 18-4, Exh. 1, and Dr. Ottey's Affidavit, ECF 18-5, Ex. 2.  The medical records exceed 40 pages.  Dr. Ottey is a licensed Maryland physician, employed by Wexford, who presently serves as the Medical Director of NBCI.  ECF 18-5 at 1.  Dr. Ottey has personally evaluated plaintiff and has also reviewed the relevant medical records.  *Id.*  The pertinent information is summarized as follows.

On May 29, 2013, Vance, then confined at Jessup Correctional Institution ("JCI"), submitted a sick call for asthma related symptoms and was seen the same day by Denvia Johnson, a physician's assistant.  After consulting with Andrew Moultrie, M.D., Johnson prescribed an Albuterol[7] inhaler and scheduled Vance for a chronic care pulmonary clinic the following week.  ECF 18-4 at 2-3.

On May 31, 2013, Vance was seen for a headache, insomnia, and nasal itching.  On a scale of 10, he rated his pain as a 5.  Vance was provided Tylenol and medication for cold symptoms.  No shortness of breath was noted.  ECF 18-4 at 4.

Vance submitted a sick call slip on June 19, 2013, complaining that he had not been seen for his chronic care visit for asthma.  He also noted the asthma bothered him daily.  ECF 18-4 at 40.

On June 26, 2013, Vance asked for "something to control his asthma" and was seen by John Moss, a physician's assistant.  Vance complained the inhaler was not working and asked for

---

[7] Albuterol is used to prevent and treat wheezing, shortness of breath, coughing, and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease. Albuterol is in a class of medications called bronchodilators. It works by relaxing and opening air passages to the lungs to make breathing easier.  *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682145.html.

a breathing test.  The medical notes indicate Vance walked from his building to the medical unit with a steady gait and conversed without distress.  Examination revealed his lungs were clear and his heart rhythms and respiration were even and clear.  ECF 18-4 at 5-6.  The inhaler was found to be functioning properly.  Vance was educated about using the inhaler and expressed his understanding.  *Id*.

Vance reported difficulty breathing on July 4, 2013, and was seen by Mercy Addai, R.N. ECF 18-5 at 4.  Examination revealed that Vance's vital signs were within normal limits and he did not appear to be in apparent distress.  *Id*.  Vance started to cough when asked to use the Peak Flow, a device for measuring air flow from the lungs and assessing the severity of asthma.  ECF 18, n. 4; ECF 18-4 at 7.  A nebulizer[8] treatment and Albuterol inhaler were ordered for Vance. He was advised to return to the medical unit if his symptoms worsened.  ECF 18-5 at 4.

 Dr. Moultrie saw Vance on July 5, 2013, for a chronic care visit for asthma.  Moultrie classified Vance's symptoms as "moderate persistent," and noted that "Symptoms have worsened" and were occurring daily.  ECF 18-4 at 9.  In addition to the Albuterol inhaler, Moultrie prescribed Qvar.  *Id*. at 10.  Qvar is a steroid inhalant that prevents lung inflammation. ECF 18, n. 5.  A follow-up chronic care visit was scheduled for three months and a chest x-ray was ordered to provide a baseline.  ECF 18-4 at 10.

On July 8, 2013, Vance presented complaints of chest pain after exposure to pepper spray.[9]  He was seen by Nnechi Chidueme, R.N.  ECF 18-5 at 5.  Scattered wheezes were

---

[8] A nebulizer is a small machine that turns liquid medicine into a mist. *See* http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000006.htm.

[9] In his reply, Vance clarifies that pepper spray was used on the compound at JCI to stop a disturbance.  It was not sprayed directly at him.  ECF 22 at 4.

observed on his upper lobes.[10]   Dr. Moultrie was contacted, and Vance was given a nebulizer

treatment per Dr. Moultrie's order.   ECF 18-5 at 5.   On July 10, 2013, Vance's x-rays were

reviewed and "showed clear lung fields."  *Id*.  Moreover, "[n]o acute disease was noted."  *Id*.

On July 20, 2013, Vance was seen by a medical provider, Mariama Coker, R.N., for

shortness of breath and difficulty breathing.   ECF 18-5 at 5.   He complained his inhalers were

not working. He appeared anxious and stated the heat was triggering his asthma. Vance's vital

signs were stable with oxygen saturztion at 95 on room air.   He was provided a nebulizer

treatment.  ECF 18-4 at 13.   Vance was told to stay out of the sun and apply a cool towel to his

forehead for heat relief.  *Id*.

Vance was transferred from JCI to NBCI on July 25, 2013.   ECF 18-4 at 14-16.   His

medications were reviewed and he was scheduled to be seen in the chronic pulmonary clinic in

one week.   No medications were transferred with Vance, and he was referred to the medication

nurse for administration of his medicine.  ECF 18-4 at 14-15.

On August 20, 2013, Dr. Ottey examined Vance in the chronic care clinic for asthma.

The medical report states the asthma was "moderate persistent," and relief of symptoms with an

inhaler was noted.   The record also reflects that Vance had not suffered any acute attacks or

emergencies within the prior six months.   ECF 18-4 at 17; ECF 18-5 at 6.   According to Dr.

Ottey, Vance never mentioned an asthma attack of August 11, 2013.   ECF 18-5 at 6.   Dr. Ottey

continued Vance's Albuterol and Qvar.  *Id*.

On September 9, 2013, Vance submitted a sick call request for a genital rash.   ECF 18-5

at 6.   According to Dr. Ottey, there is no evidence in plaintiff's medical records of a prior

---

[10]   Wheezing  is  a  sign  of  airflow  obstruction.  *See*  http://www.ncbi.nlm.
nih.gov/pubmed/8620967.

complaint of genital rash.  *Id*.  Vance complained of "jock itch" to Kristi Cortez, R.N. on September 11, 2013, when she came to his cell door.  ECF 18-4 at 20.  The medical chart reads: "Vital signs unobtainable and complete physical assessment not completed due to modified sick call at cell window/door and lock down status of institution." *Id*.  The medical chart indicates there was no sign of infection on visual assessment by Cortez.  Nevertheless, the nurse prescribed Tolnftate cream for Vance.  ECF 18-5 at 6.  And, the record does not reflect that plaintiff mentioned an asthma attack that occurred on August 26, 2013.  *Id*.

The record does not indicate that Vance reported an asthma attack on August 26, 2013, or suffering asthma-related symptoms on that date.  In his Affidavit, Dr. Ottey states that although Vance alleged in the sick call request that he had previously complained of the rash, there is nothing in the record reflecting a complaint ECF 18-5 at 6.

Vance submitted a sick call request on October 20, 2013, again complaining of a genital rash.  He indicated the medicine provided to him was not working and his condition was worsening.  Vance claimed it was his fourth such complaint.  However, the medical records indicate it was his second such complaint.  ECF 18-4 at 42; ECF 18-5 at 6.

Vance was seen by William Beeman, R.N., on November 1, 2013, for a rash and hemorrhoids.  No evidence of infection was observed.  Vance was given hydrocortisone ointment.  ECF 18-4 at 22-26.

On November 17, 2013, Dr. Ottey saw plaintiff for his asthma, in the chronic care clinic.  The medical record reflects that Vance had no acute asthma attacks or emergencies in the preceding six months.  ECF18-5 at 7.  Vance was continued on Albuterol and Qvar.  ECF 18-4 at 27-29.

On December 2 2013, Vance submitted a sick call request complaining of chest pain, congestion, and cold symptoms. ECF 18-5 at 7. On December 5, 2013, he was seen by Nurse Cortez for cold symptoms and was provided Guaifenesin, also known as Mucinex. ECF 18-4 at 30-32.

On January 31, 2014, Vance submitted a sick call slip complaining of a genital rash. ECF 18-5 at 7.

Vance missed his chronic care asthma visit on February 4, 2014, because he had a court appearance. ECF 18-4 at 33; ECF 18-5 at 7. On February 10, 2014, Vance missed a medical appointment because he was off-site. ECF 18-4 at 34; ECF 18-5 at 7.

On February 15, 2014, Vance was seen in the chronic care clinic for asthma and "groin rash." ECF 18-5 at 7. He reported the hydrocortisone cream provided relief for his rash. His Albuterol and Qvar inhalers were continued. ECF 18-4 at 35-38. Again, no acute asthma attacks in the previous six months were noted. *Id.*; *see also* ECF 18-5 at 7. A six month follow-up at the chronic care clinic was scheduled. On March 2, 2014, Vance's hydrocortisone cream was refilled. ECF 18-5 at 8.

In his Affidavit, Dr. Ottey states that Vance continues to be seen regularly by medical staff "as a chronic care inmate." ECF 18-5 at 8. Dr. Ottey attests, *id*.

> 32.   Affiant [Ottey] was never aware that Plaintiff suffered any acute asthma attacks while Plaintiff was confined at NBCI. Furthermore, no such attacks were documented in Plaintiff's medical records or reported by Plaintiff to Affiant during my numerous encounters with Plaintiff.

> ***

> 32. [sic].   It is affiant's opinion to a reasonable degree of medical probability that the care Plaintiff received from his treating medical providers for his asthma and alleged genital rash was appropriate and within the standard of care.

10

**D.  Vance's Submission of September 29, 2014 (ECF 38)**

On September 29, 2014, Vance filed a submission titled "Continued Violation In Above Captioned Complaint," which he verified.  ECF 38 at 1-3.  He also filed the Declaration of William Kyler, a fellow inmate at NBCI.  ECF 38 at 4-5.

Vance stated that he suffered a severe asthma attack on September 22, 2014, and despite his calls for help and banging on his cell door, nearly one hour passed until he was taken to the medical unit, because there were no correctional officers on his housing tier at the time.  ECF 38.  He also stated that, upon arrival in the medical unit, a nebulizer treatment was administered, and when his vital signs were checked they revealed low levels of oxygen.  *Id*.  Vance maintained that without the nebulizer treatment he received, he would have died, and averred that he "fears death, because treatment isn't administered fast enough."  *Id*. at 2.  Further, he claimed correctional officers violated Division of Corrections policy, which requires officers to remain in their assigned area until relieved by another officer.

Kyler is Vance's cell mate.  He alleged that on September 22, 2014, Vance was "definitely struggling to breathe…."  ECF 38 at 4.  According to Kyler, Vance was not taken for treatment for about 45 to 50 minutes.  *Id*. at 5.

Due to the serious nature of the allegations, I construed ECF 38 as a motion for preliminary injunction.  Accordingly, I ordered defense counsel to file an expedited show cause response as to why relief should not be granted.  ECF 39.

In their response, ECF 41, Ottey and Wexford state that Wexford is not required by contract to maintain a constant presence on the prison tiers.  They explain that medical staff rely on correctional officers and other prison personnel who patrol and monitor the tiers and to promptly notify them of medical emergencies. ECF 41-1, Exh. 1 (Affidavit of Dr. Ottey).  Upon

notification of an inmate medical emergency, medical staff will either respond to the patient on the tier or have the inmate brought to the nearest medical unit for treatment. *Id*.

Vance was seen in the medical unit on September 22, 2014, by Heather Laffey, R.N. for shortness of breath. ECF 41-2, Ex. 2 (medical records). His pulse was 91 and his respiration was 20. *Id*. His blood pressure was 120/80 and his oxygen saturation was 93% on room air. *Id*. Vance exhibited a non-productive cough and his breathing was labored when he entered the medical unit. *Id*. Vance informed Laffey that he had been using his Qvar and Albuterol inhaler with no relief. *Id*. The records indicate Vance was wheezing. *Id*. Vance was given a nebulizer treatment and his cough became productive with yellow sputum. *Id*. After treatment, his oxygen saturation was 94% on room air and his heart rate decreased by ten beats per minute. *Id*.

The State's response is at ECF 40, 42, 43. It reflects that on September 22, 2014, Vance was in NBCI Housing Unit # 4 A Tier, Cell 20. ECF 40-1, Exh. 1 (Declaration of Brandon Abe, Correctional Officer II). Abe worked in that Housing Unit on September 22, 2014, during the 11 p.m.. to 7 a.m. shift. *Id*. He averred that he conducted an informal inmate count from approximately 5:11 a.m. to 5:14 a.m., including cell A-20, where Vance was housed, and at no time did Vance complain to Abe or advise Abe that he was having breathing difficulty. *Id*.

Correctional Officer II Jerry Hartman was also working on NBCI Housing Unit # 4 on September 22, 2014, during the 11 p.m. to 7 a.m. shift. In his Declaration, ECF 40-3, Exh. 3, Hartman stated that at 5:52 a.m. he was conducting routine wing rounds when he heard Vance yelling in a loud voice for him to come to his  cell. *Id*. Because Vance was having difficulty breathing, Hartman contacted the medical department and received authorization to have Vance evaluated by medical staff. *Id*. At approximately 6:05 a.m. Vance walked without assistance to the medical room.

The video surveillance DVD of the tier for this time period shows a long range picture of the hallway, at two angles.  ECF 40-2, Ex. 2.  At different times, correctional officers are seen walking the tier. None of the individuals shown on the recording is identified, and there is no audio.  But, the recording appears to dispel the claim that corrections guards were absent from the tier on September 22, 2014.  Vance was shown the DVD on October 17, 2014.  *See* ECF 43-1 (Declaration of Randy Durst, NBCI Correctional Case Manager).

Sergeant Gerald Trenum, assigned to NBCI,  explained in his Declaration, ECF 42-1, that if an inmate needs to speak with a correctional officer, officers in Housing Unit #4 are located on the housing tier even when they are not conducting a count or informal inspection.  *Id.*  The officers can hear an inmate who is in his cell if the inmate bangs on the cell or yells in the manner Vance claims he did on September 22, 2014.  *Id.*  Trenum avers, *id.*:

> 4.  On September 22, 2014, during the 11 p.m. to 7 a.m. shift, Housing Unit 4, I was the Sergeant assigned to Housing Unit 4 A/B Control. Correctional Officers Abe and Hartman were assigned to the A/B wing as well.  If inmate Vance had been banging on his door and yelling as he claimed, one of the officers in the control center would have been able to hear him and officers would have responded to him.  I did not hear him yelling or banging on his cell as he alleges. Further, Vance's cellmate had returned to his cell after breakfast and was in the cell when Officer Abe conducted the informal count between 5:10 and 5:14 a.m. and was still in the cell with Vance when Officer Hartman conducted the count at 5:52 a.m. At no time did I hear his cellmate request assistance for inmate Vance during that time.  Housing Unit 4 was properly supervised by correctional officers during the time of inmate Vance's complaint.

## II.   DISCUSSION

### A.  Preliminary Injunction

Out of an abundance of caution, I construed ECF 38, plaintiff's complaint of "Continued Violation," as a motion for preliminary injunction in regard to his need for immediate medical care.  As noted, I issued a show cause order to defendants, ECF 39, to which defendants responded.  *See* ECF 40, 41, 42, and 43.

13

A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). A plaintiff must show that the irreparable harm he faces in the absence of relief is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).

For injunctive relief to be granted, the claimant must establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 19 (2008). All four requirements must be satisfied. *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam). Under *Winter*, the party seeking the preliminary injunction must clearly show the likelihood of succeeding on the merits. *Dewhurst v. Century Aluminum Co*., 649 F.3d 287, 290 (4th Cir. 2011).

The responses show there were corrections officers on Vance's tier at the time of his asthma attack and they acted to alert medical providers. Vance does not dispute that once officers were alerted, he was taken to the medical unit, to which he walked without assistance. Upon reaching the medical unit, Vance acknowledges a nebulizer treatment had already been prepared for him and was administered immediately. Further, Vance had access to his inhalers in his cell at the time of the asthma attack.

Vance's assertion that there were no corrections officers on the tier is without substantiation and is directly refuted by the Abe and Hartman declarations.  Although the court cannot resolve conflicting affidavits on summary judgment, I note that the contention is at odds with the DVD.  *See Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (stating that "when a video 'quite clearly contradicts the version of the story told by [the plaintiff] … so that no reasonable jury would believe it, a court should not adopt [the plaintiff's] version of the facts for purposes of ruling on a motion for summary judgment.'") (*quoting Scott v. Harris*, 550 U.S. 372, 378 (2007)).  In addition, Vance's allegation in his reply that prison guards intentionally denied him access to treatment because they were following Warden Shearin's order, ECF 46 at 4, is refuted by contemporaneous medical records.  Moreover, on September 22, 2014, Shearin was no longer the Warden at NBCI.

In sum, corrections officers were on the tier, attended to Vance's call for help, recognized his urgent need for medical assistance, and arranged for him to be brought to the medical unit to receive immediate care.  For these reasons, Vance fails to satisfy the strict requirements set forth in *Winter*, 555 U.S. at 20, as he does not show the likelihood of suffering actual irreparable harm absent preliminary relief, or that an injunction serves the public interest.[11]

### B.  Motions for Summary Judgment

---

[11] To the extent Vance is attempting to introduce in his reply an eleventh hour claim for violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*., the claim fails.  ECF 46 at 4.  The ADA prohibits qualified individuals with disabilities from being excluded from participation in or being denied the benefits of the services, programs, or activities of a public entity.  *See Conslantine v. George Mason University*, 411 F.3d 474. 498 (4th Cir. 2005); *Baird v. Rose*, 192 F.3d 462, 467 (4th Cir. 1999).  Assuming Vance's asthma qualifies as a disability under the ADA, Vance does not allege exclusion from a prison system service, program, or activity or that such exclusion was on account of the disability.

### 1.   Standards

Defendants' motions are captioned as motions to dismiss under Fed.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment under Fed.R.Civ.P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F.Supp.2d 431, 436–37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.,* 149 F.3d 253, 261 (4th Cir. 1998).[12]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not

---

[12] In contrast, a court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so.  *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp*., 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

consider it." 5 C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. duPont de Nemours and Co. v. Kolon Industries, Inc*., 637 F.3d 435, 448 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.' " *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co*., 80 F.3d 954, 961 (4th Cir. 1996)). Generally, to raise adequately the issue that discovery is needed, the party opposing the motion must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed.R.Civ.P. 56(d); *see Harrods*, 302 F.3d at 244–45 (discussing affidavit requirement of former Rule 56(f)).

In this case, plaintiff was repeatedly informed of his right to respond to the motions and to submit affidavits, declarations, and other documentary evidence in support. *See* ECF 19; 21; 33, 45. And, he has done so. *See* ECF 22, 23, 38, 46. I am satisfied that it is appropriate to address the motions as ones for summary judgment, because this will facilitate resolution of the case.

Summary judgment is governed by Fed.R.Civ.P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.,* 475 U.S. 574, 586 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings, but rather must" set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). However, the court must "view the evidence in the light most favorable to .... the nonmovant, and draw all inferences in [his] favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002); *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the court may not make credibility determinations on summary judgment. *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

Generally, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See, e.g.*, *Boone v. Stallings*, ____ Fed. App'x. ____, No. 14-6521 (4th Cir. Sept. 11, 2014) (per curiam). However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248. On the other hand, a court must award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89 94 (2007). Nevertheless, the court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir.1993), and citing *Celotex Corp.*, 477 U.S. at 323–24).

### 2.  Claims Against Shearin

Shearin advances several arguments in support of his motion for summary judgment. He contends he is entitled to judgment in his favor based on Vance's failure to exhaust administrative remedies, principles of respondeat superior, Eleventh Amendment immunity, and qualified immunity.  He also maintains he is entitled to judgment in his favor because there was no denial of constitutionally adequate medical care.

### a.  Exhaustion of Administrative Remedies

The court will first consider Shearin's contention that Vance's claims against him must be dismissed due to failure to exhaust administrative remedies.

The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, et. seq. provides, in pertinent part:

(a) Applicability of administrative remedies

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner.  Rather, the failure to

exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendant(s). *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

The Department of Public Safety & Correctional Services ("DPSCS") has made an administrative remedy procedure "available" to Maryland state prisoners, within the meaning of 42 U.S.C. § 1997e(a), for the submission of "grievance[s] against   . . . official[s] or employee[s] of the Division of Correction ["DOC"]."  Md. Code (2008 Repl. Vol., 2011 Supp.), § 10-206(a) of the Correctional Services Article ("C.S."); *see generally* C.S. §§ 10-201 *et seq.*  Regulations promulgated by DPSCS concerning the administrative remedy procedure ("ARP") define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement."  Code of Maryland Regulations ("COMAR") 12.07.01.01B(8).[13]

---

[13] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'"  *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted).  Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'"  *Id.* at 651, 898 A.2d at 960 (citation omitted).  Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC.  *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy.  *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers.  *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

In the Maryland correctional system, if the particular institution in which an inmate is incarcerated provides an administrative remedy procedure, the inmate must complete the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D.

Filing a request for administrative remedy with the Warden of the Maryland prison in which one is incarcerated is the first of three steps in the Administrative Remedy Procedure process provided by the Division of Correction to its prisoners. If this request is denied, the prisoner has ten calendar days to file an appeal with the Commissioner of Correction. If this appeal is denied, the prisoner has thirty days in which to file an appeal to the Inmate Grievance Office ("IGO"). *See* COMAR 12.07.01.03; 12.07.01.05.B; *see also* C.S. § 10-206. Complaints are reviewed preliminarily by the IGO. *See* C.S. § 10-207; COMAR 12.07.01.06. If the complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1). The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.J. § 10-208(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. C.S. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. However, a decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-209(b)-(c).

In either event, the final agency determination is subject to judicial review in Maryland state court, so long as the claimant has exhausted his/her remedies.  *See* C.S. § 10-210.  But, an inmate need not seek judicial review in state court in order to satisfy the PLRA's administrative exhaustion requirement.  *See, e.g., Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir.) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court."), *cert. denied*, 537 U.S. 949 (2002).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process.  *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003), *aff'd,* 98 Fed. App'x. 253 (4th Cir. 2004); *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Administrative remedies must, however, be available to the prisoner, and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).  The Fourth Circuit addressed the meaning of "available" remedies in *Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008):

[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

As a prisoner, administrative remedies were available to plaintiff, and thus he is subject to the strict requirements of the exhaustion provisions. *See Porter v. Nussle*, *supra,* 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). If defendants show that a claim is subject to the ARP process but has not been exhausted, the court may not consider the merits of the claim. *See Jones v. Bock*, 549 U.S. at 220; *see also Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

Vance submitted an administrative remedy procedure request on September 9, 2013, NBCI 2655-13, ECF 20-7, Exh. 5, complaining of a rash on his genitals and that he was allowed only one shower each week. The ARP was dismissed for procedural reasons because it contained multiple issues, and Vance was directed to resubmit by September 27, 2013, and to include only one issue or a reasonable number of closely related issues. *Id.*

 On September 23, 2013, Vance submitted ARP NBCI 2665-13, in which he stated he had a rash on his genital area and his requests for medication assistance had been ignored. *Id.* The matter was investigated by a registered nurse and, based on her finding, determined to be without merit. *Id.*

24

Scott Oakley, Executive Director of the IGO, states there is no record of Vance ever filing a grievance with the IGO. ECF 20-8, Exh. 6. But, Vance claims that he appealed to the Commissioner of Corrections and received no reply. ECF 1 at 2. Notably, however, Vance does not claim that he used the ARP process to present concerns about the alleged failure of prison staff to attend to his calls for help during asthma attacks.

It appears that Shearin is entitled to summary judgment in his favor as to this claim, based on failure to exhaust. But, I need not resolve this issue because even if Vance satisfied the exhaustion requirement as to all his claims, summary judgment in favor of defendants is appropriate on other grounds, as discussed below.

### b. Supervisory Liability

Section 1983 of 42 U.S.C. provides that "[e]very person" who, under color of state law, causes the violation of another's federal rights shall be liable to the party injured by his conduct. *See Owens v. Baltimore City State's Attorneys Office*, ____ F.3d ____, No. 12-2173, slip op. at 44 (4th Cir. Sept. 24, 2014). Section 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). But, a suit under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege that 1) a right secured by the Constitution or laws of the United States was violated, and 2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48

(1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir.), *cert. denied*, ____ U.S. ____, 132 S. Ct. 112 (2011).

The statute requires a showing of personal fault, whether based upon the defendant's own conduct or another's conduct in executing the defendant's policies or customs. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, it must be affirmatively shown the official acted personally to deprive the plaintiff's rights.).  In other words, there is no respondeat superior liability under § 1983. *Monell* 436 U.S. at 691); *see also Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit).

Rather, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Vance's claim against Shearin is based on a theory of respondeat superior. In other words, he has not alleged that Shearin himself participated in the matters at issue.  Instead, he imputes liability to Shearin based on the actions taken by correctional staff who worked under his supervision. Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit

authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.' " *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Vance provides no evidence to corroborate his allegation that corrections guards were ordered to deny him access to treatment or Shearin's alleged violation of DPSCS policies caused injury to his health. Vance's allegations are insufficient to confer supervisory liability, and his claims against Shearin fail.

### c. Eleventh Amendment Immunity

Vance also brings his claims against Shearin in his official capacity. ECF 1 at 1. The Eleventh Amendment bars suit in federal court, absent consent, against a state by its own citizens. *See Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356 (2001) Under the Eleventh Amendment to the United States Constitution, a state, or one of its agencies or departments, is immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Penhurst State School and Hospital v Halderman*, 465 U.S. 89, 100 (1984). Although the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code (2009 Repl. Vol.), State Gov't. Art. § 12–201(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court with respect to claims under § 1983. Thus, plaintiff's complaint, to the extent it is against the Division of Corrections, a Maryland state agency, is barred by the Eleventh Amendment.

Vance's request for monetary damages against Shearin in his official capacity for constitutional violations is barred by Eleventh Amendment immunity. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). States and their officers, sued in their

official capacities, are not "persons" subject to suit for money damages under Section 1983. *Will*, 491 U.S. at 71.

To be sure, there are several exceptions to the Eleventh Amendment bar. *See, e.g., Equity In Athletics, Inc. v. Department of Education*, 639 F.3d 91, 107 n .13 (4th Cir. 2011) (listing exceptions). Relevant here, the Eleventh Amendment does not prevent private individuals from bringing suit against State officials for prospective or declaratory relief for ongoing violations of federal law. The record, however, does not support Vance's claims of violations of constitutional and federal law, for reasons discussed herein, and there are no grounds for relief.

### d. Denial of Medical Care

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (*citing Wilson v. Seiter,* 501 U.S. 294, 297 (1991)). Conditions that "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). However, conditions that are merely restrictive, or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Jackson v. Lightsey*, ____ F.3d ____, No. 13-7291, slip op. at 15 (4th Cir. Dec. 18, 2014). A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or

one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)).

Deliberate indifference to a serious medical need requires proof that, objectively, plaintiff was suffering from a serious medical need and that, subjectively, the prison staffs were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Moreover, in a case involving a claim of deliberate indifference to a medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

The court shall assume for the sake of argument that Vance's asthma condition and genital rash constitute serious medical needs for the purpose of Eighth Amendment analysis. There is, however, no medical evidence the rash was caused by an infection, or posed a threat to plaintiff's health, other than discomfort, because it was itchy. ECF 18-4 at 36; ECF 22 at 4.

Prison officials are entitled to rely on medical judgments and the expertise of prison physicians and other medical providers concerning the course of treatment deemed necessary for prisoners. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *see also Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th Cir. 1990) (stating that supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with a prisoner's medical treatment ordered by such personnel).

As a nonmedical supervisory official, Shearin was entitled to rely on the professional judgment of prison medical personnel in treating Shearin's asthma and genital rash. Vance does not allege, nor does he provide, evidence that Shearin was aware of Vance's need for medical

attention or impeded his medical treatment. As discussed, Vance's ARP concerning a rash was investigated and denied in reliance on the findings of the investigating medical professional. Vance does not show Shearin acted with requisite deliberate indifference to his serious medical needs. In the absence of a genuine dispute as to any material fact, Shearin is entitled to summary judgment in his favor as a matter of law.[14]

### 3. Claims Against the Medical Defendants

The Medical Defendants seek judgment in their favor, asserting that liability against Wexford cannot be premised on respondeat superior in a § 1983 action and that Vance fails to demonstrate a constitutional violation as to Wexford or Dr. Ottey.

As earlier discussed, to prevail on an Eighth Amendment claim for inadequate medical care, Vance must show defendants' actions or failure to act amounted to deliberate indifference to a serious medical need. *See Estelle* v. Gamble, 429 U.S. at 105–06 (1976); *Jackson v. Lightsey*, _____ F.3d _____, No. 13-7291, slip op. at 15 (4th Cir. Dec. 18, 2014). As noted, a "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *See Farmer v. Brennan*, *supra*, 511 U.S. 825 at 837. Moreover, as noted, in a case

---

[14] As no constitutional violation has been found, this court need not reach Shearin's defense of qualified immunity.

involving a claim of deliberate indifference to a medical need, the inmate must show a "significant injury." *Danser*, 772 F.3d at 346 n.8.

"True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n. 2 (4th Cir.1997). "Actual knowledge or awareness on the part of the alleged inflicter ... becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.' " *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Id*. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

"[A]ny negligence or malpractice on the part of ... doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Of course, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk. . . ." *Brice,* 58 F.3d at 105. But, without evidence that a healthcare provider linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge requirement is not met. *Johnson,* 145 F.3d at 169 (reasoning that actions inconsistent with an effort to hide a serious medical condition refute the presence of subjective knowledge).

Although the Eighth Amendment proscribes deliberate indifference to a prisoner's serious medical needs, it does not require that a prisoner receive medical care by a provider of his choice. Moreover, the right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977). An inmate's mere disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer*, 528 F.2d 318 (4th Cir.1975)

Vance sued Wexford, a private corporation that contracts with the State to provide medical care for Maryland inmates at certain correctional institutions.[15] As noted, *respondeat superior* does not apply in § 1983 proceedings. *See Love–Lane v. Martin*, 355 F.3d at 782.  A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.*, 195 F .3d 715, 727–28 (4th Cir.1999); *Powell v. Shopco Laurel* Co., 678 F.2d 504, 506 (4th Cir.1982).  Although Wexford is entitled to dismissal solely on this basis, the court's inquiry does not end here.

Because Wexford is a contractual medical provider for the State, the deliberate indifference standard applies to Wexford and its employees. *West v. Atkins*, 487 U.S. 42, 108 (1998) (explaining that a private entity which contracts with the state to provide medical services acts "under color of state law"). Vance neither alleges nor presents any evidence that his

---

[15]   The court takes notice that Wexford is a contractual medical provider for the state. *See*, *e.g.*, *Nettles v. Medical Department*,  Civil Action No. ELH-13-2875 (D. Md. 2014).

constitutional rights were violated due to Wexford's policy or custom. Accordingly, Wexford is entitled to summary judgment as a matter of law.

In regard to Dr. Ottey, he avers that he was unaware of the asthma attacks on August 11, 2013 or August 26, 2013.  As a medical provider, Dr. Ottey depended on corrections staff to alert him to urgent medical concerns that arise on the tiers at NBCI.  Vance failed to present evidence to refute Dr. Ottey's claim that he was unaware that plaintiff suffered acute asthma attacks while at NBCI that went untreated.  Moreover, the medical record makes clear that, once aware of Vance's asthma concerns, medical providers prescribed inhalers and nebulizer treatments for him.  Although Vance may not be satisfied with the care he received, he failed to show that Dr. Ottey acted with deliberate indifference to plaintiff's medical condition.[16]

Further, Vance does not dispute that he received treatment for his genital rash. His complaint is that he was not treated by a physician for the rash and the ointment provided to him by nurses did not work or worsened the problem. Vance also complains he was provided ointment by a nurse who did not examine the affected area.

Assuming, arguendo, that the itchy rash constituted a "serious" medical need for the purpose of Eighth Amendment analysis, Vance does not show that Dr. Ottey acted with deliberate indifference to his medical need.  As noted, inmates are not constitutionally entitled to medical providers of their choice.  At most, Vance's allegations suggest disagreement with medical providers over the course of his care. His allegations do not amount to deliberate

---

[16] This ruling is without prejudice to any rights plaintiff may have to pursue claims of medical malpractice in State court. Under Maryland law, a claim of medical malpractice may proceed only after a review before the Maryland Health Claims Arbitration Board.  *See* Md. Code, Cts & Jud. Proc., § 3–2A–01 *et seq., see also Carroll v. Konits*, 400 Md. 167, 172, 929 A.2d 19, 22 (2007); *Davison v. Sinai Hospital of Baltimore Inc.*, 462 F. Supp. 778, 779–81 (D. Md. 1978). The court expresses no opinion as to the viability or merits of such a claim.

indifference necessary to premise an Eighth Amendment claim.   Absent demonstration of a genuine issue of material fact, Dr. Ottey is entitled to summary judgment in his favor.

## CONCLUSION

For the foregoing reasons, the court will deny preliminary injunctive relief to plaintiff and grant the motions for summary judgment filed by Shearin and the Medical Defendants.   ECF 18, 20, 31.   A separate Order follows.


<u>January 30, 2015</u>                             _____/s/_____
Date                                                         Ellen Lipton Hollander
                                                                  United States District Judge